IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA RECEIVED

UNITED STATES OF AMERICA,

    PLAINTIFF,

V.

AL RAY SHOEMAKER,

    DEFENDANT.

\* \* \* \* \* \* \* \*

CASE NO. CV-_____

2007 FEB -6  P 2: 20

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

1: 07 CV 112-MEF

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE
## BY A PERSON IN FEDERAL CUSTODY PURSUANT TO 28 U.S.C. SECTION 2255

Counsel for Movant respectfully submits this Memorandum of Law in support of Motion to Vacate, Set Aside or Correct a Sentence by a Person in Federal Custody, under provisions of Title 28, United States Code, Section 2255.

## I. JURISDICTION

Title 28 U.S.C. §2255 is used to test the legality of a prisoner's detention if the remedy by motion is adequate and effective. A 2255 motion is merely another step in the Defendant's criminal case and is favored over the traditional habeas corpus actions under 28 U.S.C., §2241 for cases challenging the validity of a conviction or sentencing.

In pertinent part, Title 28 U.S.C. §2255 states:

> A prisoner in custody under sentence of a court ... claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution, or laws of the United States, or that the court was without jurisdiction to impose such a sentence, or *that the sentence was in excess of the maximum authorized by law,* or is otherwise subject to collateral attack may move the court which imposed the sentence to vacate, set aside, or correct the sentence. (emphasis added.)

## II. STATEMENT OF THE CASE

### A. Course of Proceedings Below

Shoemaker pled guilty on November 2, 2005 to a one count information to aiding and abetting others by distributing a listed chemical, pseudoephedrine. The plea was pursuant to

FRCrP Rule 11(c)(1)©. Pursuant to the terms of the plea agreement Shoemaker agreed to waive his right to appeal or collaterally attack his sentence. The agreed sentencing range was no less than three and no more than five years.

On February 7, 2006 Shoemaker was sentenced to a term of 48 months. Shoemaker was designated to Maxwell Federal Prison Camp in Montgomery, Alabama. Based on life threatening health issues which will be addressed later he was transferred to the Federal Medical Center in Butner, North Carolina.

### B. Statement of the Facts

The presentence report, page 9, paragraph 40, Physical Condition, states: " The defendant is five feet eleven inches tall and weighs approximately 207 pounds. He has blonde hair and blue eyes. As confirmed by his wife, Mr. Shoemaker suffers from a hearing loss and uses hearing aids. He has glaucoma in his left eye, for which he uses a prescription eye solution. He also has hypertension and high cholesterol for which he is prescribed medication."

Shoemaker prior to his plea and sentencing had been diagnosed with a ruptured diverticulum with resulting diverticulitis and an abscess formation. A partial colectomy was performed removing 18 inches of his colon. ( Exhibit 1- Dr. Simmons Report)  His former counsel was aware of this fact and knew or should have known of Shoemaker's potential risk for cancer. A medical examination prior to the plea and sentencing was essential in this case. This is so because a medical examination would have revealed the presence of his cancer and been mitigating information for the Court at sentencing. If known, Shoemaker would have been better off not to have entered a binding 11(c)(1)© plea agreement for a sentence of between 36 and 60 months. Given the Court's new found discretion post- *Booker*, and in consideration of U.S.S.G. 5H1.4 the sentence should have and could have been considerably less.

Shoemaker while an inmate at Maxwell Federal Prison Camp became ill and was treated at Baptist Medical Center, Montgomery, Alabama. He began his term of imprisonment on March 24, 2006, and was diagnosed at Baptist with colon cancer in August 2006. It is clear the cancer

was present at the time the plea agreement was negotiated, at the change of plea, and the February 2006 sentencing.

Shoemaker was transferred to the Federal Medical Center at Butner, North Carolina for surgery. However, CAT scans revealed that his cancer had metastasized with lesions in his colon, liver and lungs. ( Exhibit 2- Dr. Hildago Report) The doctors declined to perform surgery because Shoemaker was at risk of worsening, having chronic bleeding, an obstruction or perforation, or other problems. (See Exhibit 3- Medical Report of Dr. W. Abe Andes) Dr. Andes report notes Shoemaker "certainly he does have big time incurable disease."

Another prison physician, Dr. Sam Bone, noted under impressions, "Multiple hepatic masses consistent with metastatic disease. Evidence of slight overall progression since 9-1-06 as detailed above." This report was prepared in late November 2006. It should be noted that new lesions were found( Exhibit 4- Medical Report of Dr. Sam Bone); after Shoemaker had undergone five chemotherapy sessions.

Shoemaker made application with the Bureau of Prisons for a Compassionate Release based on his terminal illness. In preparation, and in accordance with policy a Discharge Plan was completed by Robin Jackson, Senior Clinical Social Worker at the Butner facility where Shoemaker is housed. She wrote, "Mr. Shoemaker was transferred from FPC Montgomery to FMC Butner on August 24, 2006 with a diagnosis of metastatic colon cancer with spread to liver and lungs. He is terminally ill with a poor prognosis." (Exhibit 5- Jackson Report)

In a summary by the Compassionate Release Committee Karen Russell wrote," General surgery was consulted and a subtotal colectomy was planned. However, in preparation for this surgery a colonoscopy was done which revealed an unexpected lesion in the lower rectum. The surgeon elected not to operate based on the widespread metastasises to the rectal area as well as to the liver and to the lung." (Exhibit 6- Russell Report)

Shoemaker's wife sought and obtained a life expectancy prognosis from M. Scott McAllister, M.D., of Dothan Hematology and Oncology in Dothan, Alabama. On December 14,

2006 Dr. McAllister states, "statistically speaking, stage IV or metastatic colon cancer with the use of treatment, such as Folfiri could carry a prognosis of around 22 months, assuming clinical response.

Of course, several factors can alter the statistics. This is a statistically incurable disease and the goal of treatment is palliation, extension of quality of life, and potential control of the disease for as long as possible." (Exhibit 7- Dr. McAllister Report)

It is obvious that the Bureau of Prisons uses a six month life expectancy as the trigger for recommending a compassionate release. This is evident in a October 2, 2006 consultation report done by Dr. Andes wherein he stated, " I don't consider him a good compassionate release candidate at this time since I expect him to live longer than six months" (Exhibit 8- Dr. Andes Report)

This is further confirmed in a September 26, 2006 consultation report by Dr. Andes wherein he states, " He has subsequently seen folks with the compassionate release process and was told that he would be eligible for consideration. I told him I thought that was generally withheld for people with less than 6 months to live." (Exhibit 9- Dr. Andes Report)

It is clear from Dr. Andes September 26, 2006 report that he concurs with Dr. McAllister that Shoemaker's life expectancy, with treatment, gives him 22 months to live. Four months have now passed since the September 2006 report giving Shoemaker a prognosis for living no longer than 18 months.

## III. ARGUMENT

### A. DEFENDANT'S CONVICTION AND SENTENCE ARE SUBJECT TO COLLATERAL ATTACK AND HE IS ENTITLED TO RELIEF PURSUANT TO 28 U.S.C. SECTION 2255

Habeas Corpus has traditionally been regarded as governed by equitable principles. *Fay v. Noia*, 372 U.S. 391, 483, 83 S.Ct. 822, 848, 9 L.Ed.2d 837 (1963).

Due process mandates that a defendant be sentenced by a judge knowledgeable of all the material facts. In fact, the Supreme Court addressed the notion as follows:

4

The result of the procedural irregularity is that the sentence rests on a foundation of confusion, misinformation and ignorance of acts virtually material to mitigation. If justice is to be done, a sentencing judge should know all the material facts.... Fair administration of justice demands that the sentencing judge will not act on surmise, misinformation and suspicion but will impose sentence with insight and understanding. *Harris v. United States*, 382 U.S. 160, 166, 865, Ct. 353, 15 L.Ed.2d 240 (1965).

In *Davis v. United States*, 417 U.S. 333 (1973), the Supreme Court permitted a collateral attack involving a claim that a judgment that was lawful when entered should be set aside because of a later development. The subsequent development in that case, however, was a change in the substantive law that established that the conduct for which petitioner had been convicted and sentenced was lawful. In this case Shoemaker's denial of his Sixth Amendment right to counsel serves as the basis for vacating both his conviction and sentence. This should be considered in conjunction with the fact he was sentenced by a Judge without the knowledge of his risk for cancer and terminal illness.

### B. INEFFECTIVE ASSISTANCE

As noted in a consultation report done at FMC Butner by Dr. Andes on September 11, 2006, Shoemaker had previously undergone a partial colectomy where approximately 18 inches of his colon was removed about 4 years ago. This was removed for diverticulosis and he required a colostomy because of difficulty sealing off the leak. That colostomy was subsequently reversed and he began to have more normal bowel movements. However, about eight weeks ago he began to have rectal bleeding and melena and a colonoscopy revealed the lesions". ( See Exhibit 3)

Movant contends that he suffered from ineffective assistance of counsel. Under the test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant claiming ineffective assistance of counsel must prove that (1) his counsel's performance was deficient, meaning that it fell below an objective standard of reasonableness, and (2) that defendant was prejudiced thereby. Id., 466 U.S. at 690.

Former counsel was ineffective at plea negotiation and sentencing for failing to explore and present an accurate and up to date health picture given Shoemaker's past health problems, his age, and the length of sentence expected. 18 U.S.C. §3553 provided the Court the discretion to give a sentence of no more than three years. But for the ill advised plea, absent medical testing, the Court's ability to impose a sentence of less than 36 months was limited.

The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense. *Wiggins v. Smith*, 539 U.S. __,__ (2003) (slip op., at 8); *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

In determining whether counsel's conduct was deficient, this court must, with much deference, consider "whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688, 104 S.Ct. at 2065; *see Atkins* v. *Singletary*, 965 F.2d 952 (11th Cir.1992). Even under this heightened standard, it is clear McKee suffered from ineffective assistance of counsel at sentencing.

In the case of alleged sentencing errors, Shoemaker must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been significantly less harsh due to a reduction in the defendant's offense level. *United States v. Camargo-Vergara*, 57 F.3d 993, 997 -998 (11th Cir. 1995); *Spriggs v. Collins*, 993 F .2d 85, 88(5th Cir. 1993). An error increasing a defendant's sentence by as little as six months can be prejudicial within the meaning of *Strickland*. See *Glover v. United States*, 531 U.S. 198, 202-04, 148 L.Ed.2d 604, 121 S.ct. 696 (2001).

## IV. COMPASSIONATE RELEASE

The Warden at Butner, Art Beeler recommended Shoemaker for a Compassionate Release pursuant to 18 U.S.C. §3582(c)(1)(A). However, on November 20, 2006 Regional Director K.M. White denied the request and provided the following rationale, "Mr. Shoemaker is 64 years old and has been diagnosed with metastatic carcinoma of the colon, liver and lungs. He is

6

currently ambulatory and able to complete daily living activities." (Exhibit 10-Regional Director

White's Memorandum)  Given this denial Shoemaker has no remedy available without Court

intervention.

## V. SHOEMAKER REQUESTS AN EVIDENTIARY HEARING

Contested fact issues, in a proceeding on a Motion to Vacate a federal conviction and

sentence, must be decided on the basis of an evidentiary hearing and not on affidavits.

*Montgomery v. United States*, 469 F. 2d 148 (5th Cir. 1972).

In post conviction proceedings such as 28 U.S.C. §2255, the statute calls for

evidentiary hearings unless the motion, files, and records of the case <u>conclusively</u> show that the

Movant is entitled to no relief. *Fountaine v. United States*, 411 U.S. 213, 96 S.Ct. 1461, 36

L.Ed. 2d 169 (1973) (per curium).

The Defendant, denied of an opportunity to be heard, "has lost something

indispensable however convincing the ex parte showing." *United States v. Hayman*, 342 U.S.

205, 220, 72 S.Ct. 263, 96 L.Ed. 232 (1952), citing *Snyder v. Massachusetts*, 692 F.2d 565

(1982), an evidentiary hearing under the present circumstances is mandated.  The Ninth Circuit, in

*Bauman v. United States*, 692 F.2d 565 (1982), held that a "hearing is mandatory whenever the

record does not affirmatively manifest the factual or legal invalidity of the petitioner's claims."

This legal authority and the sound reasoning associated should be equally applicable to the case at

bar.  The facts of this case are distinguishable from those noted in *United States v. McGill*, 11 F.

3d 223 (1st Cir. 1993), because it cannot be said in Movant's case that an evidentiary hearing

would serve no purpose.

## VII.  CONCLUSION

Wherefore for all the foregoing reasons, Shoemaker requests that his conviction be

vacated or at the very least that he be granted a re-sentencing.  His plea and sentencing rested on

the ineffective performance of his counsel as relates to his failing health.  He was also sentenced

by a Judge without full knowledge of the facts.

7

Respectfully submitted this ___ day of February 2007.

_____
Susan G. James (ASB-7956-J64S)
Attorney for Movant

Address of Counsel:
Law Office of
Susan G. James and Associates
600 S. McDonough St. - P.O. Box 198
Montgomery, AL  36101-0198
334/269-3330
334/263-4888 (Fax)

## CERTIFICATE OF SERVICE

I hereby certify that a true and complete copy of the foregoing was served upon Tommie Hardwick, Assistant United States Attorney,  P.  O.  Box 197, Montgomery, Alabama 36101 this ___ day of February, 2007.

The above instrument was served via:
( ) personal service
( ) first class mail
( ) certified mail, return receipt requested
( ) facsimile
( ) overnight courier

_____
Of Counsel

8

# EXHIBIT 1

WIREGRASS MEDICAL CENTER
1200 W. MAPLE AVE.
GENEVA, AL  36340

O P E R A T I V E   R E P O R T

| | | |
|---|---|---|
| Patient Name: SHOEMAKER AL | Number: 479207 | Admit Date: 12/18/03 |
| Sex: M          Age: 61 | Med Record: 263521011 MR | Disc. Date:  00/00/00 |
| Date of Birth: 02/24/1942 | Type: I/P       Room#: 620-A | Physician: SIMMONS JOHN F |
| | | Physician Number: 001000 |

DATE OF PROCEDURE:
12/18/03

PREOPERATIVE DIAGNOSIS:
INCARCERATED VENTRAL HERNIA

POSTOPERATIVE DIAGNOSIS:
MULTI-LOCULATED INCARCERATED VENTRAL HERNIA WITH MASSIVE INTRAABDOMINAL ADHESIONS

OPERATIVE PROCEDURE:
EXPLORATORY LAPAROTOMY WITH LYSIS OF ADHESIONS AND REPAIR OF A MULTI-LOCULATED INCARCERATED
VENTRAL HERNIA

REFERRING PHYSICIAN:
J.F. SIMMONS, M.D.

INDICATIONS: THE PATIENT IS A 61 YEAR OLD WHITE MALE WHO HAS PREVIOUSLY UNDERGONE A PARTIAL
COLECTOMY FOR A RUPTURED DIVERTICULUM AND RESULTING DIVERTICULITIS AND ABSCESS FORMATION.
THE PATIENT HAD A TEMPORARY DIVERTING COLOSTOMY.  THIS WAS SUBSEQUENTLY CLOSED.  ALL OF
THESE PROCEDURES TOOK PLACE IN AN OUTSIDE INSTITUTION.  THE PATIENT HAS NOW DEVELOPED A
LARGE INCARCERATED VENTRAL HERNIA ALONG THE MAJORITY OF THE MIDLINE INCISION.  HE ALSO HAS A
SIGNIFICANT DEGREE OF PAIN AND TENDERNESS AND A SUGGESTION OF A MASS BENEATH THE PREVIOUS
OSTOMY SITE.

PROCEDURE: THE PATIENT WAS TAKEN TO THE OPERATING ROOM, PLACED IN THE SUPINE POSITION,
GENERAL ANESTHESIA WAS ADMINISTERED.  THE PATIENT'S ENTIRE ABDOMEN WAS STERILELY PREPPED AND
DRAPED.  USING A NUMBER 15 SCALPEL THE PREVIOUS MIDLINE INCISION WAS RE-INCISED.  THE
SUPERFICIAL SUBCUTANEOUS TISSUE WAS DIVIDED WITH THE BOVIE CAUTERY.  MULTIPLE INCARCERATED
HERNIA SACS WERE ENCOUNTERED IN THE SUBCUTANEOUS TISSUE.  USING A COMBINATION OF GENTLE
BLUNT DISSECTION WITH A HEMOSTAT AND OCCASIONAL DISSECTION WITH THE BOVIE CAUTERY THESE
HERNIA SACS WERE DISSECTED AWAY FROM THE SURROUNDING ADIPOSE TISSUE DOWN TO THE LEVEL OF THE
FASCIA.  THE SACS WERE EACH OPENED WITH A SCALPEL.  MULTIPLE LOOPS OF INTESTINE WERE
INCARCERATED WITHIN THE HERNIA SAC AS WERE SEVERAL PORTIONS OF OMENTUM.  A VERY TEDIOUS AND
PROLONGED PAINSTAKING PROCESS WAS THEN UNDERTAKEN TO DISSECT THE ADHESED INTESTINES AWAY
FROM THE UNDER SURFACE OF THE ANTERIOR ABDOMINAL WALL.  THIS WAS ACCOMPLISHED UNDER DIRECT
VISION BY MAINTAINING GENTLE DOWNWARD TRACTION ON THE INTESTINES AND DIVIDING THE ADHESIONS
BETWEEN THE INTESTINES AND THE ABDOMINAL WALL WITH EITHER A SCALPEL OR THE METZENBAUM
SCISSORS.  LIKEWISE, THE ADHESIONS BETWEEN THE OMENTUM AND ABDOMINAL WALL WERE DIVIDED IN A
SIMILAR FASHION.  ONCE THE UNDER SURFACE OF THE ANTERIOR ABDOMINAL WALL HAD BEEN FREED OF
INTESTINES AND OMENTUM THE MIDLINE INCISION WAS FULLY OPENED.  ATTENUATED FASCIA WAS EXCISED
WITH THE BOVIE CAUTERY.  SEVERAL LOOPS OF BOWEL WERE FOUND TO BE INCARCERATED WITHIN A SMALL
HERNIA AT THE PREVIOUS OSTOMY SITE.  THESE WERE REDUCED OUT OF THE HERNIA.  ADHESIONS
BETWEEN THE INTESTINES AND ABDOMINAL WALL WERE AGAIN DIVIDED USING THE METZENBAUM SCISSORS
UNDER DIRECT VISION. THE FASCIAL DEFECT AT THE OSTOMY SITE WAS THEN CLOSED USING A
COMBINATION OF A RUNNING STITCH OF NUMBER ONE VICRYL AND INTERRUPTED STITCHES OF BRAIDED
NYLON.

WIREGRASS MEDICAL CENTER
1200 W. MAPLE AVE.
GENEVA, AL  36340

## OPERATIVE REPORT

| | | |
|---|---|---|
| Patient Name: SHOEMAKER AL | Number: 479207 | Admit Date: 12/18/03 |
| Sex: M          Age: 61 | Med Record: 263521011  MR | Disc. Date: 00/00/00 |
| Date of Birth: 02/24/1942 | Type: I/P          Room#: 620-A | Physician: SIMMONS JOHN F |
| | | Physician Number: 001000 |

THE SMALL INTESTINE WAS RUN THROUGHOUT ITS COURSE BEGINNING AT THE ILEOCECAL VALVE AND EXTENDING PROXIMALLY.  MULTIPLE LOOPS OF SMALL BOWEL WERE DENSELY ADHESED TO EACH OTHER. THESE ADHESIONS WERE DIVIDED UNDER DIRECT VISION USING A SCALPEL WITH THE METZENBAUM SCISSORS.  EVENTUALLY, ALL OF THE SMALL BOWEL WAS ABLE TO BE FREE OF ADHESIONS.  AT THIS POINT THE ABDOMEN WAS IRRIGATED WITH WARM NORMAL SALINE.  A FINAL CHECK WAS MADE FOR HEMOSTASIS.  NO BLEEDING WAS NOTED.  THE LINEA ALBA WAS THEN CLOSED USING A COMBINATION OF A RUNNING STITCH OF NUMBER ONE VICRYL WHICH WAS BUTTRESSED WITH INTERRUPTED STITCHES OF BRAIDED NYLON. THE SKIN WAS CLOSED WITH SKIN CLIPS.  HE TOLERATED THIS VERY PROLONGED AND TEDIOUS PROCEDURE WELL, WAS TAKEN FROM THE OPERATING ROOM, TO THE RECOVERY ROOM, IN STABLE CONDITION.


DALE MITCHUM, M.D.
DATE DICTATED: 12/19/03
DATE TYPED: 12/19/03/lm/1:00 P.M.

# EXHIBIT 2

BP-S622.060 **RADIOLOGIC CONSULTATION REQUEST/REPORT** CDFRM
JUL 99
**U.S. DEPARTMENT OF JUSTICE**                              **FEDERAL BUREAU OF PRISONS**

| **Patient Identification:** Name, Register Number, Date of Birth, Institution<br><br>SHOEMAKER, Al<br>11720-002<br>02/24/42<br>FMC Butner | Age: 64 | Sex: M | Examination Performed:<br>❖  contrast enhanced CT of the chest, abdomen, and pelvis |
|---|---|---|---|
| | Pregnant:    No | | |
| | Diabetic: | | Unit: 4D |
| | Requested By:<br>BOWENS PA-C | | Date Requested:<br>08/15/06 |

| History/Indications for Study:<br>❖ |
|---|

| Date of Study:<br>09/01/06  (Friday) | Date Dictation Received:<br>09/01/06  (Friday) | Date Dictation Transcribed:<br>09/05/06  (Tuesday) | Film: |
|---|---|---|---|

## RADIOLOGIC REPORT

**Procedure:**  5 mm helical images obtained from the lung apices to the pubic symphysis.  A total of 150 cc of Isovue 300 were injected for the chest, abdomen, and pelvis.  Oral contrast was given.

**Comparisons:**  Ø

## FINDINGS
**CT Chest:**
The mediastinum is unremarkable.  No focal pulmonary nodules can be identified.  No focal infiltrates are seen.  No evidence of mediastinal mass is evident.  The bones are unremarkable.

**CT Abdomen & Pelvis:**
There are multiple liver masses evident.  These involve the right and left lobe of the liver and are most consistent with multiple metastases.  The largest mass is located in the lateral segment of the left lobe and measures 3.4 cm in largest diameter.  There is a left sided adeno-myolipoma in the adrenal gland.  It is largely replaced with fat and measures 3.8 cm in largest diameter.  There are adrenal calcifications present bilaterally likely related to prior infection.  The kidneys are unremarkable.

In the abdominal cavity there is a soft tissue mass surrounding the region of the ascending colon.  There is an adjacent mass measuring 1.8 cm.  In addition there are borderline lymph nodes present more medially.  This is most consistent with patient's suspected carcinoma of the ascending colon.

CT of the pelvis demonstrates no masses and no adenopathy.

Bone windows demonstrate no destructive lesions.

## IMPRESSION
1.  Multiple liver metastases.
2.  Adeno-myolipoma of the left adrenal gland that is incidental.
3.  Bilateral adrenal calcifications likely related to prior infections.

| Signature:               HECTOR HIDALGO, M.D. | Location of Radiologic Facility<br>FMC Butner |
|---|---|

Original - Medical Record; Copy - Physician; Copy - Radiology
(This form may be replicated via WP)          This form replaces BP-S622 dtd AUG 96



# EXHIBIT 3

CONSULTATION REPORT

U.S. DEPARTMENT OF JUSTICE                                    FEDERAL BUREAU OF PRISONS

| Name:    SHOEMAKER, Al | Institution:    FMC Butner |
|---|---|
| Reg. #:    11720-002 | Consultant:    ANDES MD |
| DOB: | |

| Reason for Consult/Disease: |||
|---|---|---|
| ☞ synchronous colon cancer with metastases; hyperlipidemia; diverticulosis; chronic back pain secondary to osteoarthritis ||| 
| Date of Visit/Dictation: 09/11/06<br>(Monday) | Dictation Received: 09/12/06<br>(Tuesday) | Dictation Transcribed: 09/12/06<br>(Tuesday) |

## CONSULT → MEDICAL ONCOLOGY

**SUBJECTIVE:**
This is the first visit for this 64 y/o gentleman with me but he was also seen by Dr. Silon. He had problems with his GI tract. He had a hemoglobin of about 12.1 with an MCV of 85 back in June of this year. He did not realize he had been bleeding but thought that he had just become anemic and somehow responded to iron. His hemoglobin was most recently measured on 8/29 and was 12.3 but his MCV was then down to 80. His platelets were slightly elevated and he has found to have synchronous colon cancer at the rectosigmoid junc-tion and in the transverse colon as shown by biopsy. He had had a partial colectomy of approximately 18" removed about 4½ years ago. This was removed for diverticulosis and he required a colostomy because of difficulty sealing off the leak. That colostomy was subsequently reversed and he began to have more normal bowel movements. However, about 8 weeks ago he began to have rectal bleeding and melena and colonoscopy revealed the lesions. I gathered that the colonoscopist did not believe there was cancer at the transverse colon but the pathologist felt that he did. The mass at the rectosigmoid junction was clearly a problem but he did not have stricture there as he did at the mid transverse. He was sent here and apparently surgery saw him without a CAT scan and felt that resection would be in order but subsequent CAT scan done 9/1 revealed the chest was unremarkable without nodules. The abdomen revealed "multiple liver masses" involving the right and left lobes with the largest area being about 3.4 cm in the lateral segment of the left lobe. He was also thought to have a myolipoma in the adrenal gland at about 3.8 cm. They did see a soft tissue mass surrounding the region of the ascending colon so I suppose that the mass at the ascending colon could be either nodes or even a third malignancy not apparent on colonoscopy. The bones looked unremarkable. He denies abdominal pain whatsoever. MRI of the lumbar spine revealed degenerative disc disease at almost all levels. He took Dr. Winston's comments to be that he had no trouble other than what was in his intestinal tract and that surgery would potentially cure this with an operation. I have told him that I believe both of those doctors did not have CAT scans to rely on and certainly he does have big time incurable disease.

He has had good control of his blood pressure and other problems and has actually been gaining weight with all of the problems going on. He has not had a definitive decision made by surgery regarding his colon as far as I can tell.

**OBJECTIVE:**
HT 5'1", BP 113/98, P 72, 100% saturation on room air, R 16, T 98. His head is normocephalic without trauma. His abdomen is grossly obese. His liver was however about 11.5 cm, within my normal range, in the right midclavicular line without tenderness or rebound. There was no bruit in the abdomen or spleen and no mass was palpable. I could not find lymphadenopathy. His chest revealed decreased breath sounds bilaterally. He had no pedal edema. His reflexes were 2+. He was alert and cooperative.

**ASSESSMENT & PLAN:**
Mr. Shoemaker was essentially crushed when I told him what I thought was going on. I apologized but told him he needed to know what this was about and where we believed he had disease. I was already worried when I saw that his CEA was about 76. He said his wife would be distraught as a "devout Christian" and he did break down 2-3 times during our review of things. He's been in prison a little over 5 months and has some years yet to serve. I reviewed with him the fact that I thought the disease was probably incurable with the extent of his problem. He then immediately suggested he was "terminal" but I disputed that distinctly and on several occasions pointed out while he did have significant amounts of disease, nothing was in vital organs and he had had no treatment for any of it! I told him I wasn't sure surgery was really required for this situation but Dr. Winston and I would discuss that and let the surgeons help decide. I subsequently did call Dr. Winston, who felt surgery was not necessarily required and I don't really see the point either. Certainly he could worsen or have chronic bleeding, obstruction, or perforation, or other problems but neoadju-vant chemotherapy might also be a help for him. I'm going to go ahead and order iron studies today, repeat the CEA, and I plan on treating him next week with FOLFIRI. I'm also going to start him on iron and try to get a PortaCath put in before we treat him. He understands these issues and is still hopeful. I think by the end he did understand about the extent of his disease as best anyone could educate him. He was disappointed of course. I explored several options with him and again emphasized that he was not terminal but had an advanced disease we could certainly treat and hopefully help him a great deal. He understands this.

| Signature: | _W. ABE ANDES, M.D._  9/12/06 | **DICTATED BUT NOT READ** |
|---|---|---|
| WAA/th | | Preliminary report until signed. |



U.S. DEPARTMENT OF JUSTICE

CONSULTATION REPORT

FEDERAL BUREAU OF PRISONS

| Name: SHOEMAKER, Al<br>Reg. #: 11700-002<br>DOB: | Institution: FMC Butner<br>Consultant: ANDES MD |
|---|---|
| Reason for Consult/Disease:<br>⬦ synchronous colon cancer with metastases; hyperlipidemia; diverticulosis; chronic back pain secondary to osteoarthritis | |
| Date of Visit/Dictation: 09/11/06<br>(Monday) | Dictation Received: 09/12/06<br>(Tuesday) | Dictation Transcribed: 09/12/06<br>(Tuesday) |

## CONSULT → MEDICAL ONCOLOGY

**SUBJECTIVE:**

This is the first visit for this 64 y/o gentleman with me but he was also seen by Dr. Silon. He had problems with his GI tract. He had a hemoglobin of about 12.1 with an MCV of 85 back in June of this year. He did not realize he had been bleeding but thought that he had just become anemic and somehow responded to iron. His hemoglobin was most recently measured on 8/29 and was 12.3 but his MCV was then down to 80. His platelets were slightly elevated and he had been found to have synchronous colon cancer at the rectosigmoid junc-tion and in the transverse colon as shown by biopsy. He had had a partial colectomy of approximately 18" removed about 4½ years ago. This was removed for diverticulitis and he required a colostomy because of difficulty sealing off the leak. That colostomy was subsequently reversed and he began to have more normal bowel movements. However, about 8 weeks ago he began to have rectal bleeding and melena and colonoscopy revealed the lesions. I gathered that the colonoscopist did not believe there was cancer at the transverse colon but the pathologist felt that he did. The mass at the rectosigmoid junction was clearly a problem but he did not have stricture there as he did at the mid transverse. He was sent here and apparently surgery saw him without a CAT scan and felt that resection would be in order but subsequent CAT scan done 9/1 revealed the chest was unremarkable without nodules. The abdomen revealed "multiple liver masses" involving the right and left lobes with the largest area being about 3.4 cm in the lateral segment of the left lobe. He was also thought to have a myeloma in the adrenal gland at about 3.8 cm. They did see a soft tissue mass surrounding the region of the ascending colon so I suppose that the mass at the ascending colon could be either nodes or even a third malignancy not apparent on colonoscopy. The bones looked unremarkable. He denies abdominal pain whatsoever. MRI of the lumbar spine revealed degenerative disc disease at almost all levels. He took Dr. Winston's comments to be that he had no trouble other than what was in his intestinal tract and that surgery would potentially cure this with an operation. I have told him that I believe both of those doctors did not have CAT scans to rely on and certainly he does have big time incurable disease.

He has had good control of his blood pressure and other problems and has actually been gaining weight with all of the problems going on. He has not had a definitive decision made by surgery regarding his colon as far as I can tell.

**OBJECTIVE:**

HT 5'1", BP 113/96, P 72, 100% saturation on room air, R 16, T 98. His head is normocephalic without trauma. His abdomen is grossly obese. His liver was however about 11.5 cm, within my normal range, in the right midclavicular line without tenderness or rebound. There was no bruit in the abdomen or spleen and no mass palpable. I could not find lymphadenopathy. His chest revealed decreased breath sounds bilaterally. He had no pedal edema. His reflexes were 2+. He was alert and cooperative.

**ASSESSMENT & PLAN:**

Mr. Shoemaker was essentially crushed when I told him what I thought was going on. I apologized but told him he needed to know what this was about and where we believed he had disease. I was already worried when I saw that his CEA was about 76. He said his wife would be distraught as a "devout Christian" and he did break down 2-3 times during our review of things. He's been in prison a little over 5 months and has some years yet to serve. I reviewed with him the fact that I thought the disease were probably incurable with the extent of his problem. He then immediately suggested he was "terminal" but I disputed that distinctly and on several occasions pointed out while he did have significant amounts of disease, nothing was in vital organs and he had had no treatment for any of it! I told him I wasn't sure surgery was really required for this situation but Dr. Winston and I would discuss that and let the surgeon help decide. I subsequently did call Dr. Winston, who felt surgery was not necessarily required and I don't really

# EXHIBIT 4

BP-S622.060 RADIOLOGIC CONSULTATION REQUEST/REPORT CDFRM
JUL 99
U.S. DEPARTMENT OF JUSTICE                              FEDERAL BUREAU OF PRISONS

| Patient Identification: Name, Register Number, Date of Birth, Institution | Age: 64 | Sex: M | Examination Performed: |
|---|---|---|---|
| | | | ⚘ contrast enhanced CT scan of the abdomen utilizing 150 ml Isovue 300 IV, oral contrast |
| SHOEMAKER, Al | Pregnant:    No | | |
| 11720-002 | Diabetic: | | Unit: 3C |
| 02-24-42 | Requested By: | | Date Requested: |
| FMC Butner | ANDES MD | | 11-15-06 |

| History/Indications for Study: |
|---|
| ⚘ follow-up colon cancer |

| Date of Study: 11-21-06 [Tuesday] | Date Dictation Received: 11-21-06 [Tuesday] | Date Dictation Transcribed: 11-26-06 [Sunday] | Film: |
|---|---|---|---|

## RADIOLOGIC REPORT

**Procedure:**
**Comparisons:**     9-1-06

## FINDINGS
Imaged portions of the lung bases demonstrate a minimal parenchymal density in the right azygoesophageal recess which has diminished and may represent an area of infiltrate or atelectasis.

Within the liver, multiple low density masses are present, consistent with metastatic disease.  A few lesions have shown slight enlargement.  One such lesion is a 1.5 cm lesion inferiorly within the right lobe of the liver on image #24, increased from 1.0 cm on the prior study.  There is a newly demonstrated lesion of approximately 1 cm in the lateral segment near the falciform ligament on image 12.  Most lesions however are relatively stable to minimally increased.

The spleen is unremarkable.  Two small structures adjacent to the spleen consistent with accessory spleens are noted.  In addition however there are soft tissue masses present anterior to the ascending colon on image 31 which have enlarged slightly in size and another within the transverse mesocolon of approximately 1 cm which is stable.

There is no ascites identified.  Minimal umbilical hernia containing only fat.

Coarse calcification is identified in the adrenal glands bilaterally.  In addition, there is a fatty mass of the left adrenal gland with some soft tissue density elements consistent with a myelolipoma.

## IMPRESSION
1.   Multiple hepatic masses consistent with metastatic disease.  Evidence of slight overall progression since 9-1-06 as detailed above.
2.   Stable soft tissue mass in the transverse mesocolon.
3.   Slight interval enlargement of mass anterior to the ascending colon.
4.   Not fully imaged on this study, focal wall thickening in the ascending colon.
5.   Bilateral adrenal calcification most consistent with healed granulomatous disease or other prior inflammatory process.
6.   Left adrenal mass predominantly composed of fatty tissue consistent with myelolipoma.
7.   Minimal umbilical hernia.

| Signature: _____ SAM BONE, M.D. | Location of Radiologic Facility FMC Butner |
|---|---|

Original – Medical Record; Copy – Physician; Copy – Radiology
(This form may be replicated via WP)          This form replaces BP-S622 dtd AUG 96

10

# EXHIBIT 5

### DISCHARGE PLANS FOR COMPASSIONATE RELEASE
### SOCIAL WORK SERVICES - MEDICAL
### FEDERAL MEDICAL CENTER
### FEDERAL CORRECTIONAL COMPLEX
### Butner, North Carolina

**Name:**       Al Shoemaker
**Reg#:**       11720-002
**DOB:**        02/24/1942
**SSN:**
**Next of Kin:** [ B-7-c.  B-6 ]
**Physician:**  Dr. Winston

**Current Situation:**
Inmate Shoemaker is a 64 year old married, White male from West Palm Beach, Florida, serving a 48 month sentence plus two years Supervised Release for Controlled Substance - Sell, Dispense/Aiding and Abetting Possession with Intent to Distribute Methamphetamine. His projected release date is September 14, 2009 Via Good Conduct Release. He has been housed at the Federal Prison Camp, Montgomery, Alabama (FPC Montgomery) and the Federal Medical Center in Butner, North Carolina (FMC Butner).

Mr. Shoemaker was transferred from FPC Montgomery to FMC Butner on August 24, 2006 with a diagnosis Metastatic colon cancer with spread to liver and lung. He is terminally ill with a poor prognosis.

Mr. Shoemaker stated that he has never been treated for a mental illness. He reports drinking alcohol on a social basis and denies using any other substances.

**Criminal Background**
Mr. Shoemaker has been convicted of the following prior offenses: Open Container (2001) and Unlawful Display of a Firearm (2003).

**Current Diagnosis**
Metastatic colon cancer with spread to liver and lung

**Proposed Residence When Released**
Mr. Shoemaker will reside with       B7-c-  B-6       in Hartford, Alabama. He indicated that he would received follow up care at Wiregrass Hospital in Geneva, Alabama. He reported his medical care would be financed through Social Security , Medicaid and Blue Cross and Blue Shield.

**Family Support/Community Support**
A telephone interview was conducted with        B7-C/B-6 on October 10, 2006  to discuss the
potential release plan        B7-C- B-6
Currently, she lives alone. ___ __ ..
part time.  She described her home as being one level with 4 bedrooms and 1 and ½ baths.
                                        medical expenses would be covered through Social
Security, Medicaid and Blue Cross Blue Shield.


        B7-C- B-6


**Finance**
With the assistance of FMC Butner staff, Mr. Shoemaker will apply for Social Security Benefits.
He also reports he has medical coverage through Blue Cross and Blue Shield.

**Medical Care**
Mr. Shoemaker will receive medical care from Southeast Alabama Medical Center, 1108 Ross
Clark Circle, Dothan, Alabama, 36301; phone 334-793-8111.  Should the family desire hospice
services, Wiregrass Hospice serves the geographic area.  Their contact information is as follows:
2740 Headland Avenue, Dothan, Alabama, 36303, phone number: 334-792-1100.

**Summary**
Mr. Al Shoemaker is serving a 48 month sentence . He was convicted of Controlled Substance -
Sell, Dispense/Aiding and Abetting Possession with Intent to Distribute Methamphetamine. If
released, he will return to a stable home in Hartford, Alabama.       B7-C - B-6       has
expressed a strong desire to provide support to him. He will receive  medical services from the
Southeast Alabama Medical Center.  This medical facility is within close proximity to    B7-C - B6



Robin Jackson, LCSW, BCD
Senior Clinical Social Worker

## Psychosocial Assessment

**Name:**           Al Shoemaker
**Reg#:**            11720-002
**DOB:**             02/27/1942
**SSN:**             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
**Next of Kin:**     Sarah Shoemaker
**Physician:**       Dr. Winston

### Family of Origin

Mr. Shoemaker is a 64 year old White male. He was born in West Palm Beach, Florida, to B7-C B-6. Mr. Shoemaker's parents divorced when he was approximately 3 years old. He reports his mother later married B7-C - B6. Mr. Shoemaker reports that his stepfather was extremely abusive; both verbally and physically. Mr. Shoemaker's B7-C/B6 moved to Atlanta, Georgia and worked as a contractor. Records indicate he passed away in 2002. Mr. Shoemaker has one brother, B7-C - B-6. who resides in White, Georgia, and two half siblings. B7-C - B-6 (age 55). Both reside in Florida. Mr. Shoemaker reports he was reared by his mother and stepfather in Florida until he turned 16 years old. At that time, his mother moved him to Horseshoe Beach, Florida to live with his maternal uncle. Mr. Shoemaker's mother passed away in 1988.

### Education/Employment History

Mr. Shoemaker attended public schools in Cross City, Florida. He graduated in 1960. He reports he then attended a Vocational School in Tampa, Florida, where he learned the trade of pipe fitter.

Mr. Shoemaker's work history consists of the following:
1962-1980: Mr. Shoemaker worked as a pipe fitter through a local union in Tampa, Florida.
1981-1988: Mr. Shoemaker owned/operated his own company Wiregrass Welding in Hartford, Alabama.
1988- Present: Mr. Shoemaker and B7C-B6 own and operate Al's BP in Hartford, Connecticut. AL

### Relationship History

Mr. Shoemaker married B7-C/B6 in 1961. The two divorced in 1968. There couple had one son. B7-C-B-6. Mr. Shoemaker married B7-C-B-6 1969. The couple had one son together, B7-C B-6 He currently lives in Atlanta, Georgia. Mr. Shoemaker married B7-C-B6 in 1975 and divorced in 1979. The couple had no children together.

Mr. Shoemaker met and married B7-C - B6 r in 1979. The couple have been married for 27 years. B7-C B-6

Shoemaker, Al
Reg# 11720-002
page 2

## Mental Health History
Mr. Shoemaker denies any past or present mental health treatment.

## Substance Abuse History
Mr. Shoemaker reports he has drank alcohol "on occasion."   He denies use of any other substances.

## Summary
Mr. Shoemaker was transferred from the Federal Prison Camp in Montgomery, Alabama (FPC Alabama) to the Federal Medical Center in Butner, North Carolina (FMC-Butner) with Metastatic colon cancer with spread to liver and lung He is terminally ill with a poor prognosis.

If released from prison, Mr. Shoemaker plans to live with          B-6 - B7-c in Hartford, Alabama.  During a telephone interview,  B-6 - B7-c   expressed a strong willingness to support                            She also identified other family members and friends as a source of support as well.  Mr. Shoemaker will apply for social security disability  to cover medical expenses.  He also has medical insurance coverage through Blue Cross and Blue Shield. He has identified a medical facility to provide continuity of care.


Robin Jackson, LCSW, BCD
Senior Clinical Social Worker

EXHIBIT 6

Brandi Kaz - med summary.wpd

## COMPASSIONATE RELEASE COMMITTEE

Date _____11 October 2006_____

Inmate Name: _Shoemaker, Al_____     Reg. No._11720-002___
_____

Housing Unit_4D___

Physician: _James Winston, M.D._____

Current diagnosis: Metastatic colon cancer with spread to liver and lung

Past medical history: hypertension; history of chronic low back pain; bilateral hearing loss; glaucoma; hyperlipidemia; diverticulosis

Case summary :

This patient is a 64 year old male who underwent a colectomy (having 8 inches of the colon removed) approximately four years ago. At that time he had a colostomy which was subsequently reversed. In July of 2005 he presented with rectal bleeding and melena. A colonoscopy revealed a tumor in the rectosigmoid junction with a stricture with ulceration in the mid-transverse colon. Pathology from these areas showed well to moderately differentiated invasive adenocarcinoma. A CT scan of the chest done 09/26/06 showed multiple nodules in both lungs measuring up to 10 mm in diameter worrisome for metastatic disease. A CT scan of the abdomen done 09/01/2006 revealed multiple liver metastases. General surgery was consulted and a subtotal colectomy was planned. However, in preparation for this surgery a colonoscopy was done which revealed an unexpected lesion in the lower rectum. The surgeon elected not to operate based on the widespread metastases to the rectal area as well as to the liver and to the lung.

Mr. Shoemaker is currently ambulatory and his current level of functioning is fairly good. He is quite anxious and depressed about his diagnosis and poor prognosis. He has been able to remain somewhat active and is currently undergoing chemotherapy in an attempt to prolong his life expectancy.

B - 5

Summary prepared by Karen Russell, PA-C

Brandi Kex - SW summary.wpd

October 10, 2006

Compassionate Release-Shoemaker, Al Ray
11720-002

Ms. Pyant received a copout from Inmate Shoemaker on September 22, 2006, requesting the process be initiated for a "medical compassionate release". The Tumor Board met to discuss his case. **B-5**

Inmate Shoemaker provided the necessary information for release/discharge planning. He indicated that if released he would live with **B7-c - B-6** 06 **B7-c - B-6** He indicated that he would receive follow up care from Dr. Simmons at the Wiregrass Hospital in Geneva, Alabama. He reported his medical care would be financed thru Blue Cross and Blue Shield Insurance (he also has a Cancer Supplement through Colonial Healthcare).

A telephone interview was conducted with **B7-c / B-6** on October 10, 2006 to discuss the potential release plan. **B7-c - B-6** would live with her if released. **B7-c - B-6** currently lives alone in the house. She described their home as being one story with 3 bedrooms and 1 ½ bathrooms. **B7-c - B-6** However, she reported she is selling the business to ensure she will have **B7-c - B-6** medical care would be financed through Blue Cross and Blue Shield and Colonial Healthcare.

**B7-c/B-6** would receive his medical aftercare through the hospital in Geneva, Alabama (twelve miles from their home) or the Alabama Medical Center in Dothan, Alabama (twenty five miles from their home). **B7-c - B-6** reported she would be able to provide twenty four hour care

**B7-c - B-6** identified, her two sons, ( **B7-c - B-6** ) as support systems. Both live within 3 miles of her home.

Inmate appears to have an intact family. This writer has no concerns regarding his support system.

**Primary caretaker**

**B7-c
B-6**

# EXHIBIT 7

# DOTHAN HEMATOLOGY AND ONCOLOGY, P.C.

DOCTORS BUILDING
1118 ROSS CLARK CIRCLE, SUITE 200
DOTHAN, ALABAMA 36301
(334) 793-4804
1-800-239-4804
(334) 793-2523 FAX

RAFAEL D. MAYOR, M.D.
THOMAS W. BROWN, M.D.
JOHN R. DUNN, M.D.
SCOTT MCALLISTER, M.D.

December 14, 2006

Dear Sir or Madam:

Statistically speaking, stage IV or metastatic colon cancer with the use of treatment, such as FOLFIRI could carry a prognosis of around 22 months, assuming clinical response.

Of course, several factors can alter the statistics. This is a statistically incurable disease and the goal of treatment is palliation, extension of quality of life, and potential control of the disease for as long as possible.

If there are any questions please do not hesitate to call.

Cordially,

M. Scott McAllister, M.D.
MSM/ar

# EXHIBIT 8



CONSULTATION REPORT

U.S. DEPARTMENT OF JUSTICE                                    FEDERAL BUREAU OF PRISONS

| **Name:** SHOEMAKER, Al | **Institution:** FMC Butner |
|---|---|
| **Reg. #:** 11720-002 | **Consultant:** ANDES MD |
| **DOB:** | |

| Reason for Consult/Disease: |
|---|
| ① metastatic colon cancer   ② diverticulosis   ③ chronic low back pain secondary to osteoarthritis |

| Date of Visit/Dictation: 10/02/06 (Monday) | Dictation Received: 10/02/06 (Monday) | Dictation Transcribed: 10/03/06 (Tuesday) |
|---|---|---|

## CONSULT → MEDICAL ONCOLOGY

**SUBJECTIVE:**
Mr. Shoemaker was in today and had obviously been speaking with just about everybody he could get a hold of including Dr. Winston, Ms. Pine, and so forth. He is still hopeful of getting a Compassionate Release. He has not had new problems with pain, nausea/vomiting, hematochezia, bleeding, or other symptoms. He recognizes that he's had the CT scan showing widespread metastatic disease.

**OBJECTIVE:**
WT 199, HT 5'11", T 98.2, P 75, R 20, BP 122/65, 98% saturation. His head is normocephalic. He looks well. His color is good. Port's unremarkable.

**ASSESSMENT & PLAN:**
I had a long discussion again with Mr. Shoemaker. He obviously wants to have treatment since he's now changed his mind and is not refusing therapy he says. He had the PortaCath put in but that doesn't really matter to me about his prognosis and/or his application for Compassionate Release. With the amount of therapy he has he might very well die in less than 6 months without therapy but with therapy one would expect him to live longer and I told him I would put that in the writing as I'm doing here. He got the impression that people did leave here with treatment going and I pointed out to him that was true but those were people who had failed most therapies and were on therapy beyond the usual and with a prognosis different than his. I'm not sure he understands that yet but will try again tomorrow morning to make that quite evident. I don't consider him a good Compassionate Release candidate at this time since I expect him to live longer than 6 months. Other factors are not known to me. He understands finally I think and does want treatment, which I think is a decent decision. I asked him if he wanted to wait two weeks to start or to go ahead and start tomorrow. He wants to start tomorrow and I think that's also a good decision since I don't see a reason to wait. In that regard we will start with FOLFIRI in the morning.

| Signature: | _W. Abe Andes_ 10/5/06 |
|---|---|
| | W. ABE ANDES, M.D. |

WAA/th                                                          *Preliminary report until signed.*



# EXHIBIT 9

CONSULTATION REPORT

U.S. DEPARTMENT OF JUSTICE                    FEDERAL BUREAU OF PRISONS

4D

| **Name:** SHOEMAKER, Al<br>**Reg. #:** 11720-002<br>**DOB:** | **Institution:** FMC Butner<br>**Consultant:** ANDES MD |
|---|---|

Reason for Consult/Disease:
☞ ① metastatic colon cancer   ② depression

| Date of Visit/Dictation: 09/26/06<br>(Tuesday) | Dictation Received: 09/27/06<br>(Wednesday) | Dictation Transcribed: 09/28/06<br>(Thursday) |
|---|---|---|

## CONSULT → MEDICAL ONCOLOGY

Mr. Shoemaker was in and has had an eventful time since I last saw him. He went out to Durham Regional Hospital and actually went to the OR and was put to sleep in anticipation of colon resection. However, when colonoscopy was done they saw an unexpected lesion down in the low rectum apparently and that was biopsied. We do not have that report yet. He then had a CT scan done of the chest which the patient tells me was concerning for metastatic colon cancer also and it was also recognized, though the films were not sent with the patient to surgery, that he had liver lesions. He was subsequently told by Dr. Burns that he would not be operated on and was sent back here. He has subsequently seen the folks with the Compassionate release process and was told that he would be eligible for consideration. I told him I thought that was generally withheld for people with less than 6 months to live. However, he may have a lot longer than that to live with or without treatment.

Clearly, the likelihood of doing well without therapy is less and he then may become a candidate but with therapy, some might take the view that he has "22" months to live. I suggested strongly that he let us discuss his case at the tumor conference Monday and go from there. He did agree but remains a DNR. He also told me he suspects he will not agree to therapy in this institution because he wants to go home and be with his wife. Meanwhile, I also did receive a handwritten note about his lung CT which then makes the third CT done this month. That suggests that he has up to 10 mm lesions in the lung.

WT 197, HT 5'11", 99% saturation, R 20, 97 degrees, P 80, BP 121/68. His head is normocephalic without trauma. His neck is supple. I don't feel any nodes there. The rest of the time was spent face to face and trying to console the patient from his crying and other breakdown evidence. He agreed to this plan finally and it seems like a good one to me.

| Signature: _____ 9/26/06<br>W. ABE ANDES, M.D. | DICTATED BUT NOT READ |
|---|---|

*WAA/th*                                    *Preliminary report until signed.*



# EXHIBIT 10



**UNITED STATES GOVERNMENT**

# memorandum

**FEDERAL BUREAU OF PRISONS**
Mid-Atlantic Regional Office
Annapolis Junction, MD 20701

November 20, 2006

**MEMORANDUM FOR**    **A. F. BEELER, WARDEN**
**FEDERAL MEDICAL CENTER, BUTNER**

**FROM:**    K. M. White, Regional Director

**SUBJECT:**    REDUCTION IN SENTENCE
Shoemaker, Al Ray, Reg. No. 11720-002

Please be advised that inmate Shoemaker's request for a reduction in sentence (RIS) pursuant to 18 U.S.C. §3582(c)(1)(A) is denied. I have reviewed all the documentation submitted with this request.

Mr. Shoemaker is 64 years old and has been diagnosed with metastatic carcinoma of the colon, liver and lungs. He is currently ambulatory and able to complete daily living activities.

While Mr. Shoemaker suffers from a serious medical condition, his life expectancy is unknown at this time and his current treatment is aimed at prolonging his life-expectancy.

Accordingly, I will deny the request at this time. The denial of this request constitutes an administrative decision by the Regional Director. The inmate may appeal this decision through the Administrative Remedy process.

Please provide Mr. Shoemaker with a copy of this decision.